IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| CENTER FOR A SUSTAINABLE COAST, and KAREN GRAINEY, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:19-cv-58-LGW-BWC |
| NATIONAL PARK SERVICE, U.S. Department of the Interior; and GARY INGRAM, in his official capacity as Superintendent, Cumberland Island National Seashore, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## I.       Introduction

The legislation designating Cumberland Island a National Seashore, (the "Seashore Act"), requires the island to be "permanently preserved in its primitive state," with the exception of development for certain public recreation activities. 16 U.S.C. § 459i-5(b). But the Superintendent of Cumberland Island National Seashore signed a statement notifying Georgia Coastal Resources Division that the National Park Service ("NPS") does not object to the construction of a dock by a private property owner within the National Seashore. The National Park Service's statement of no-objection for the construction of a private dock was final agency action in violation of the Seashore Act.

II.     Facts

Lumar, LLC ("Lumar"), an owner of property within the boundaries of the Cumberland Island National Seashore (the "Seashore"), sought permission from the Georgia Coastal Resources Division ("GCRD") and the U.S. Army Corps of Engineers (the "Corps") to build a dock over coastal marshlands within the Seashore. *Complaint*, ¶¶ 15-16. GCRD asked Lumar's adjacent property owners to state whether they concurred or objected to the dock. *Complaint*, ¶ 17.

In response, the Seashore's Superintendent signed a statement, in violation of the Seashore Act, notifying GCRD that, as an adjacent property owner, the National Park Service does not object to the construction of a dock by a private property owner within the Seashore. *Complaint*, ¶ 1.

The statement of no-objection increased the likelihood that the GCRD and the Corps would grant Lumar authorization to construct the dock, *Complaint*, ¶ 20, and in fact, after receiving the statement of no-objection, the GCRD: (a) issued Lumar a Letter of Authorization to build the dock; and (b) provided a notice of concurrence and no objection for the Corps to issue a Letter of Permission to build the dock. *Complaint*, ¶ 21. Then, in reliance on the GCRD's concurrence, the Corps issued a Letter of Permission to Lumar to build the dock. *Complaint*, ¶ 22.

The Plaintiffs alleged in a lawsuit filed in Fulton County Superior Court that Lumar violated Georgia's Coastal Marshlands Protection Act, O.C.G.A. § 12-5-291(a)(5) ("the "Marshlands Act"), by constructing the dock

without a Marshlands Act permit. The Marshlands Act states that the Georgia Superior Court, upon finding that any person is or has been violating any of the provisions of the Marshlands Act, "may order the person to restore, as nearly as possible, all marshland to the condition existing prior to the alteration of the marshland." *Complaint*, ¶¶ 23-24.

If the Plaintiffs prevail in the state-law case, Lumar will need to remove the dock or obtain a permit from the GCRD to maintain the dock. If the Plaintiffs prevail in this federal case, and this Court sets aside the statement of no-objection, the GCRD will be less likely to issue a permit to Lumar. *Complaint*, ¶ 25.

The Plaintiffs have alleged that they have been and will be injured by the statement of no-objection, issued in violation of the Seashore Act, *Complaint*, ¶¶ 4, 7, and that the Defendants' violation of the Seashore Act creates an increased risk of and actual harm to the environment which can be redressed by this Court. *Complaint*, ¶¶ 6, 7. These injuries would be redressed by the relief sought. *Complaint*, ¶¶ 6, 7.

### III.    Argument

#### A.  Standard of Review

Congress waived the United States' sovereign immunity concerning claims that fall within the scope of the Administrative Procedure Act, 5 U.S.C. §§ 551–706. *See* 5 U.S.C. § 702. "The Administrative Procedure Act provides specifically not only for review of '(a)gency action made reviewable by statute' but also for review of 'final agency action for which there is no other

adequate remedy in a court.'" *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) *citing* 5 U.S.C. § 704. The legislative material explaining the APA "manifests a congressional intention that it cover a broad spectrum of administrative actions." *Abbott Labs*, 387 U.S. at 140. "As a general rule, actions taken by federal administrative agencies are subject to judicial review." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003) *citing* 5 U.S.C. § 706.

On a motion to dismiss, a "complaint should be liberally construed in favor of the plaintiff." *Bracewell v. Nicholson Air Servs., Inc.*, 680 F.2d 103, 104 (11th Cir. 1982). The allegations in a complaint "are taken as true" for the purposes of a facial attack under FED.R.CIV.P. 12(b)(1). *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)

B. **The Court Has Subject Matter Jurisdiction Under the APA Because the Defendants' Statement of No-Objection Was Final Agency Action**

The Defendants argued in Section I.b. of their *Motion* that the APA does not provide subject matter jurisdiction because the statement of no-objection is not final agency action. "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process,—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d

4

1229, 1236 (11th Cir. 2003), *quoting Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (further citations omitted).

But "[a]s the Supreme Court has instructed, we are to apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. United States Environmental Protection Agency*, 801 F.2d 430, 435 (D.C. Cir. 1986), *quoting Abbott Labs. v. Gardner*, 387 U.S. 136, 149-150 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). And in reviewing the *Plaintiffs' Complaint* and applying the law in a flexible and pragmatic way, the Court should find that the NPS' statement of no-objection was final agency action.

Defendants contend the statement of no-objection "was at most a non-final part in the permitting process." (*Def. Motion* at 8). Defendants cite *Andrews v. United States Health and Human Serv.*, 2005 U.S. Dist. LEXIS 5710, at *10 (D.D.C. Mar. 31, 2005) to support their contention that the National Park Service's statement of no-objection was not final agency action. (*Def. Motion* at 7). In *Andrews*, the plaintiffs alleged that they could save money if they could buy prescription drugs from Canada. The Food, Drug & Cosmetic Act provided that the Secretary of the U.S. Department of Health and Human Services "may waive the prohibition on reimportation of drugs from Canada for certain groups and individuals," but the waiver "does not become law until the Secretary certifies that its implementation would 'pose no additional risk to the public's health and safety' and 'result in a significant

reduction in the cost of covered products to the American consumer.'" 2005 U.S. Dist. LEXIS 5710, at *9.

The Secretary made no such certification. The Secretary had not refused to issue a waiver certification in response to a citizen petition, an adjudicatory decision, or as part of a rulemaking." *Id*. at * 10. Instead, the Secretary had only stated in response to a letter signed by U.S. Senators "that he was 'unable to make the determinations' Congress required" to trigger the Act's waiver provisions. *Id*. The "fact that the Secretary has not made these certifications," *Id*. at * 9, is not comparable to the National Park Service's statement expressly declaring that the agency had no objection to construction of a private dock within the Cumberland Island National Seashore.

Defendants' reliance on *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006) is similarly misplaced. (*Def. Motion* at 7-8). The Wild Free–Roaming Horses and Burros Act granted the Secretary of the Interior jurisdiction over all wild free-roaming horses on federal lands. 460 F.3d at 15. When the BLM determines that an area of public lands is overpopulated, the agency is required to remove excess animals from the range. *Id.* at 16.

Before taking such action, the BLM prepares a detailed "gather plan." *Id.* at 16. In response to a population explosion, BLM prepared a plan that would, if implemented, achieve nationwide an appropriate population level of wild horses. *Id*. Congress approved funding for the program and field offices began implementing individual gathers on a herd-by-herd basis. *Id*. at 17.

Plaintiffs filed suit to enjoin the BLM from continuing to implement the strategy. Plaintiffs' challenge to specific removal actions became moot. *Id.* at 18. Plaintiffs also alleged that the agency violated the Wild Horses and Burros Act by adopting a strategy that would reduce herd populations to below their appropriate management levels. *Id. at Id*.

The plaintiffs cited two documents claimed to be final agency action. *Id. at* 18. One of those documents was an "Instruction Memorandum" that had expired, so the court found that claim moot. *Id. at* 18-19.

The other document claimed to be final agency action was a budget request to Congress. *Id. at* 19. The budget request explained why the existing funding amount was insufficient for the agency to achieve appropriate management levels of wild horses. *Id.* As noted by the court, "[b]udget requests seek funding for an agency to exercise its power." *Id*. Once Congress appropriates the funds, the agency must determine how to use the money consistent with the appropriation. *Id. at* 20. "The agency's proposal to Congress, developed to secure the funds, may serve as a useful planning document," but it was not final agency action with any "actual or immediately threatened effect." *Id. at* 20. citing Lujan v. National Wildlife Federation, 497 U.S. 871, 894 (1990). Unlike the BLM's budget request, the NPS's statement of no-objection had an immediately threatened effect.

Defendants rely on *St. Andrews Park, Inc. v. United States Department of the Army Corp of Engineers* to contend that the "Sustainable Coast's rights and obligations were the same the day after NPS sent the Letter as they were

the day prior." (*Def. Motion* at 7, *citing St. Andrews Park, Inc.*, 314 F.Supp.2d 1238, 1245 (S.D. Fla. 2004)). The phrase "rights and obligations" is from the second condition set forth in *Bennett v. Spear*: "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. at 178.

This condition does not specifically refer to rights or obligations of a Plaintiff, although it can be that. Here, Lumar obtained rights from the National Park Service's statement of no-objection, and legal consequences flowed from the statement. Because the statement harmed and/or increased the risk of harm to Plaintiffs, and because the statement marked "the 'consummation' of the agency's decisionmaking process," Plaintiffs have a right to challenge the agency's decision to issue the statement.

In *St. Andrews Park, Inc.*, the Corps issued a "preliminary jurisdictional determination" to identify waters of the U.S. subject to regulation under the Clean Water Act. 314 F. Supp. 2d at 1240-41. The Corps advised the property owners that a field visit would be necessary to verify the upland/wetland boundary for purposes of determining the jurisdictional line and issuing a final jurisdictional determination. *Id.* at 1241. Instead of allowing the Corps onto the property for verification of the upland/wetland boundary, the landowners sought a declaratory judgment that the wetlands on their property were not subject to Clean Water Act jurisdiction.

The Corps' preliminary determination in *St. Andrews Park* is not comparable to the National Park Service's statement of no-objection, which marked the consummation of the agency's decision-making process.

The NPS' statement of no-objection significantly increased the likelihood that GCRD and the Corps would allow Lumar to build a dock within the Cumberland Island National Seashore. After GCRD received the statement of no-objection, it: (a) issued Lumar a Letter of Authorization to build the dock; and (b) sent a notice of concurrence and no objection for the Corps to issue a Letter of Permission to build the dock. And in reliance on GCRD's concurrence, the Corps issued Lumar a Letter of Permission to build the dock. *Complaint*, ¶¶ 21-22.

Contrary to the Defendants' argument as to the second *Bennett* condition, the statement of no-objection was indeed an action by which rights or obligations have been determined, or from which legal consequences will flow. The statement set forth the agency's position as to whether it objected to Lumar's proposed dock. That statement conveyed certain rights to Lumar, namely, the right to proceed with its application without objection from the National Park Service.

*See also*, 5 U.S.C. § 551(13) ("'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"); and 5 U.S.C. § 551(11):

> "'relief' includes the whole or a part of an agency--
>
> (A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or
exception; or

(C) taking of other action on the application or petition of, and
beneficial to, a person."

"Because the definition of action under the APA is so broad, the critical

inquiry is whether the action is final." *In re MDL-1824 Tri-State Water Rights*

*Litig.*, 644 F.3d 1160, 1181 (11th Cir. 2011). "The bite in the phrase 'final

action' ... is not in the word 'action,' which is meant to cover comprehensively

every manner in which an agency may exercise its power.... It is rather in the

word 'final,' which requires that the action under review 'mark the

consummation of the agency's decisionmaking process.'" *Whitman v. Am.*

*Trucking Ass'ns,* 531 U.S. 457, 478 (2001).

The right to proceed without objection from the NPS was especially

critical given that: (1) the NPS carries the mandate to "permanently preserve"

the Seashore "in its primitive state," 16 U.S.C. §459i-5(b), and (2) the NPS is a

recognized authority in environmental matters. *E.g.,  Coalition for Canyon*

*Preservation, Inc. v. Hazen*, 788 F.Supp. 1522, 1529 (D. Mont. 1990) (it was

"not unreasonable that the Corps of Engineers would rely upon the expertise of

the National Park Service to ensure that the proposed project was compatible"

with natural resource values"). *See also, High Point, LLLP v. Nat'l Park Serv.*,

850 F.3d 1185, 1200 (11th Cir. 2017) *citing* 36 C.F.R. § 5.7 ("the Park Service

regulations prohibit private parties from "[c]onstructing or attempting to

construct a ... boat dock ... upon[,] across, over, through, or under any park

without permission"). Given the National Park Service's mandate to preserve

10

the Seashore and its recognized expertise, its decision to issue the statement of no-objection carried great weight with each agency.

Defendants argue that "[a]n action that does not itself adversely affect a plaintiff, but only adversely affects his rights on the contingency of future administrative action, is not a final agency action." (*Def. Motion* at 8, *citing Alabama v. U.S. Army Corps of Engineers*, 382 F. Supp. 2d 1301, 1323 (N.D. Ala. 2005)). In *Alabama v. U.S. Army Corps of Engineers*, the State of Alabama sued the Corps for entering into water withdrawal contracts with local governments in Georgia and for entering into contracts for water supply storage at Lake Allatoona. 382 F. Supp. 2d at 1318. The court held that the Corps' entry into those contracts constituted final agency action because it was "a discrete action that marked the consummation of the agency's decision-making process, and because the water supply and water withdrawal contracts determined rights and obligations and had legal consequences." 382 F. Supp. 2d at 1324.

The government official who signed the statement of no-objection, Defendant Gary Ingram, was National Park Service Superintendent of the Seashore. *Complaint*, ¶¶ 8, 9, 19. *See*, 36 C.F.R. §1.4 ("*Superintendent* means the official in charge of a park area or an authorized representative thereof."). Mr. Ingram's statement of no-objection was a final statement of the agency's position, *Alabama,* at 1323-24 ("Entering into the contracts was … a definitive statement of the Corps' position permitting water withdrawal and water storage

without the need for further agency review."),[1] from the Seashore's highest

official. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("An agency

action is not final if it is only 'the ruling of a subordinate official.'").

     *See also, Darby v. Cisneros*, 509 U.S. 137, 144 (1993) ("'[T]he finality

requirement is concerned with whether the initial decisionmaker has arrived at

a definitive position on the issue that inflicts an actual, concrete injury ....'")

(citation omitted); and *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478–79

(2001) ("Only if the 'EPA has rendered its last word on the matter' in question,

is its action 'final' and thus reviewable.") (citation omitted).

     Because the statement of no-objection was NPS's final statement on the

issue, because it was from the Seashore's highest official, because it carried

great weight with the Corps and GCRD due to NPS's recognized expertise in

the field, because it determined rights with respect to the dock, and because it

was an action from which legal consequences flowed, the statement was final

agency action.

    C.  **The Plaintiffs Have Standing**

     The Defendants argued in Section II of their *Motion* that, even if the

statement of no-objection was final agency action, the Plaintiffs lack standing.

     "In order to establish standing, a plaintiff must allege (and eventually

prove): (1) an injury in fact, which means harm to the plaintiff that is concrete

---

[1] *See also Sierra Club v. United States Army Corps of Engineers*, 446 F.3d
808, 813 (8th Cir. 2006) (holding that a "definitive statement" of the agency's
position "is final for purposes of judicial review despite the 'possibility of
further proceedings in the agency' to resolve subsidiary issues."), *quoting Bell
v. New Jersey*, 461 U.S. 773, 779-780 (1983).

and actual or imminent; (2) causation; and (3) redressability, which means a likelihood that the requested relief will redress the injury." *Miccosukee Tribe of Indians v. Southern Everglades Restoration Alliance*, 304 F.3d 1076, 1080 (11th Cir. 2002), *citing Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998). A plaintiff's burden of proving these elements "is relatively modest at [the motion to dismiss] stage of the litigation." *Bennett*, 520 U.S. at 170-171; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65 (1987) ("[O]ur standing cases uniformly recognize that allegations of injury are sufficient to invoke the jurisdiction of a court. In *Warth v. Seldin*, 422 U.S. 490, 501 (1975), for example, we made clear that a suit will not be dismissed for lack of standing if there are sufficient 'allegations of fact'—not proof—in the complaint or supporting affidavits.").

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000); *Complaint* ¶¶ 5-7.

Defendants do not dispute that Plaintiffs have been injured. The Defendants contest only the second and third factors, which "typically 'overlap as two sides of a causation coin.'" *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n. 1 (D.C. Cir. 2017) (citation omitted) ("After all, if a government action causes an injury, enjoining the action usually will redress that injury.").

13

With respect to the second factor, causation, as the Defendants pointed out, "requires 'a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011), *quoting Lujan*, 504 U.S. at 560. However, a "showing that an injury is 'fairly traceable' requires less than a showing of 'proximate cause.' Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Resnick v. Avmed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (citation omitted). *See also Scenic America, Inc. v. United States Department of Transportation*, 983 F.Supp.2d 170, 180 (D.D.C. 2013) (the "challenged government policy [need not] compel a third party to act in order to establish a causal relationship")

In this regard, Defendants argued, "NPS neither built a dock at Cumberland nor authorized the same. Third parties not before this Court, not NPS, thus caused the Sustainable Coast's alleged injury." (*Def. Motion* at 9). In support of this argument, Defendants cite *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976), which states that Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." (*Def. Motion* at 9). In *Simon*, plaintiffs challenged a Revenue Ruling that allegedly

14

"encouraged" hospitals to deny services to indigents by extending tax benefits to such hospitals despite their refusals to fully serve indigent patients. But the Court held it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 42-43.

In the present case, GCRD requires the applicant to provide a form to adjacent property owners so that such owners can inform GCRD whether they object or concur with the request to construct a dock. (*Complaint*, ¶ 17). It logically follows that GCRD's reliance on an adjacent owner's concurrence or objection is more than "purely speculative." *Simon,* 426 U.S. at 42-43.

Plaintiffs aver that NPS's actions led to (caused) Lumar to receive authorization to construct the dock. *Complaint*, ¶¶ 17-22. That is sufficient under the Plaintiffs' "relatively modest" burden of proof at this stage. *Bennett,* 520 U.S. at 170-171.

The Eleventh Circuit has applied this holding to the type of argument raised by the Defendants: "However, the Supreme Court rejected a similar argument in *Bennett v. Spear*, stating: 'This wrongly equates injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.'" *Tenn. Valley Auth. v. U.S.E.P.A.*, 278 F.3d 1184, 1207 (11th Cir. 2002), *opinion withdrawn in part on other grounds sub nom. Tennessee Valley Auth. v. Whitman*, 336 F.3d 1236 (11th Cir. 2003), *quoting Bennett*, 520 U.S. 154, 168-69 (holding that the TVA, as

15

well as private utilities and industry associations, had standing to seek to set aside orders issued to it by the EPA).

In the *TVA* case, EPA argued that the utilities did not have standing to sue over EPA's order. It claimed that "the injuries alleged by the private petitioners are highly speculative — resulting, if at all, from decisions made by TVA in order to comply with EPA's orders." The Eleventh Circuit rejected that argument even though EPA's orders did not apply to any of the utilities. *TVA*, 278 F.3d at 1205. The Court found standing due to the "interconnectedness" of the utilities' electric transmission networks with TVA's networks. *Id.* at 1206-07.

That is fundamentally what the Plaintiffs have alleged in their *Complaint*; NPS's actions are "interconnected" or "interrelated" to GCRD's actions and the Corps' actions. The Plaintiffs did not claim that the Defendants' action was "the very last step in the chain of causation." But it was a fairly traceable step. The Plaintiffs laid that out clearly in their *Complaint*: (1) Lumar sought permission to build a dock (¶ 16); (2) GCRD asked the adjacent property owners (including NPS) if they concurred or objected (¶ 17); (3) NPS stated that it had no objections (¶ 19); (4) GCRD authorized the dock (¶ 21); and (5) the Corps authorized the dock (¶ 22). Each succeeding step depended and was based on the prior step, and that is why the Plaintiffs have standing – all of the relevant entities' actions are related. *E.g., TVA, supra.* The Plaintiffs further alleged that the statement of no-objection

increased the likelihood that the GCRD and the Corps would grant Lumar authorization to construct the dock. *Complaint*, ¶ 20.

In another Supreme Court case, *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991), an interest group sought a declaration that an Act of Congress was unconstitutional. The Act authorized the transfer of operating control of two airports from the Federal Government to the Metropolitan Washington Airports Authority (MWAA). The Act conditioned the transfer on MWAA's creation of a "Board of Review" composed of Members of Congress and vested with veto power over decisions made by MWAA's Board of Directors. *Id.* at 255, 262.

The Supreme Court summarily rejected the MWAA's and the Board of Review's claim that the interest group did not have standing. The Court held, "If we accept that the master plan's provisions will result in increased noise, pollution, and danger of accidents, this 'personal injury' to respondents is 'fairly traceable' to the Board of Review's veto power because knowledge that the master plan was subject to the veto power **undoubtedly influenced** MWAA's Board of Directors when it drew up the plan." *Id.* at 264-265 (emphasis added).

The Court thus held that the fact that one governmental entity's actions influenced another governmental entity's actions was sufficient to establish standing. And that is precisely what the Plaintiffs are arguing here. NPS's decision (the statement of no-objection) undoubtedly influenced GCRD's and

17

the Corps' decision. In other words, the Plaintiffs' injury is fairly traceable to NPS's statement of no-objection.

For these reasons, the Plaintiffs have properly alleged causation, and the Defendants' argument as to causation should be rejected. *Florida Public Interest Research Group Citizen Lobby, Inc. v. Environmental Protection Agency*, 386 F.3d 1070, 1085 (11th Cir. 2004) ("Moreover, there seems to be little dispute that the plaintiffs have satisfied the other prongs of the standing inquiry. The purported injury – caused by the continued pollution of the state's waterbodies – is fairly traceable to the EPA's failure to review the Impaired Waters Rule, since use of the Rule **could result** in polluted waterbodies being left off the Impaired Waters List and not being cleaned.") (emphasis added).

With respect to the third factor, redressability, the Defendants claimed that the Plaintiffs have not met this factor because their injury is not redressable by an order from this Court. They argued that, even if the Court sets aside the statement of no-objection, that will not lead to the dock's temporary or permanent removal. (*Def. Motion* at 10).

"Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Fla. Wildlife Federation, Inc. v. South Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1303-04 (11th Cir. 2011) (citation omitted).

*See also*, *Utah v. Evans*, 536 U.S. 452, 464 (2002): "in terms of our 'standing' precedent, the courts would have ordered a change in a legal status

18

(that of the 'report'), and the practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered. We have found standing in similar circumstances. See, *e.g., Federal Election Comm'n v. Akins,* 524 U.S. 11, 25 (1998) (standing to obtain court determination that the organization was a 'political committee' where that determination would make agency more likely to require reporting, despite agency's power not to order reporting regardless)."

Plaintiffs' *Complaint* seeks to set aside the statement of no-objection, which will, if Plaintiffs prevail in their state-law case, begin the process of reversing the actions described in ¶¶ 21-22 of the *Complaint*: GCRD's and the Corps' authorization of the dock. This redress is not "purely speculative."

Plaintiffs alleged, in Fulton County Superior Court, that Lumar violated Georgia's Coastal Marshlands Protection Act by constructing the dock without a Coastal Marshlands Protection Act permit. Case No. 2019-CV-317139. (*Complaint*, ¶ 23). The Coastal Marshlands Protection Act states that the Superior Court, upon finding that any person is or has been violating any of the provisions of the Coastal Marshlands Protection Act, "may order the person to restore, as nearly as possible, all marshland to the condition existing prior to the alteration of the marshland." O.C.G.A. § 12-5-291(a)(5) (*Complaint*, ¶ 24).

If Plaintiffs prevail in the Fulton County case, Lumar will need to remove the dock or seek a permit from Georgia Coastal Resources Division to

construct or maintain the dock on Cumberland Island. (*Complaint*, ¶ 25).[2] If Plaintiffs also prevail in the above-styled case and this Court sets aside NPS' statement of no-objection to the dock, Georgia Coastal Resources Division will be less likely to issue a permit to Lumar. (*Complaint*, ¶ 25).

Simply because other federal and state agencies will be involved in this process does not mean that redressability vanishes. *Terrebonne Parish Branch NAACP v. Jindal*, 274 F.Supp.3d 395, 408 (M.D. La. 2017) ("[T]he fact that the Secretary of State plays a role in maintaining and overseeing the electoral method of the 32nd JDC does not mean that causation and redressability are absent with respect to Defendants [the Governor and the Attorney General]."), *citing K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (plaintiff had standing to sue a board even though board was far "from sole participant in the application of the challenged statute").

Further, "redressability does not require complete victory or full relief." *National Parks Conservation Association v. United States Department of Interior*, 46 F.Supp.3d 1254 (M.D. Fla. 2014) *aff'd*, 835 F.3d 1377 (11th Cir. 2016) (finding standing) (*citing Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007) ("While it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to slow or reduce it.

---

[2] The Superior Court dismissed Plaintiffs' case, but Plaintiffs will file a *Notice of Appeal. Cf. Ark Initiative v. Tidwell*, 749 F.3d 1071, 1076 (D.C. Cir. 2014) (where standing turns on an interpretation of law, a plaintiff "need not convince the court that its interpretation is correct."

… That risk [of global warming] would be reduced to some extent if

petitioners received the relief they seek.") (finding standing)); *see also*

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012)

("[E]ven if [plaintiff] would not be out of the woods, a favorable decision

would relieve their problem 'to some extent,' which is all the law requires.").

　　　　And that is the redress that the Plaintiffs are seeking in this Court. They

are seeking a start to the process of prohibiting the private dock within the

Cumberland Island National Seashore. This Court cannot "by itself reverse" all

of the decisions that led up to the dock being authorized, *Massachusetts v.*

*EPA, supra*, but "a favorable decision would relieve their problem 'to some

extent.'" *Consumer Data, supra*. A favorable decision will relieve the

Plaintiffs' problem to some extent because it will create a situation where "an

order directed to a party before the court will significantly increase the chances

of favorable action by a non-party." *Klamath Water Users Ass'n v. F.E.R.C.*,

534 F.3d 735, 740 (D.C. Cir. 2008), *citing National Parks Conservation*

*Association v. Manson*, 414 F.3d 1, 6-7 (D.C. Cir. 2005) ("there was evidence

that a 'district court order setting aside Interior's letter... would significantly

affect [Montana's] ongoing proceedings," which was "enough to satisfy

redressability").

　　　　And in *Metropolitan Washington Airports Authority*, the Court held,

"Because invalidation of the veto power will prevent the enactment of the

master plan, the relief respondents have requested is **likely** to redress their

alleged injury." *Metropolitan Washington Airports Authority, supra* at 265

(emphasis added). Once again, that is what the Plaintiffs are alleging. Setting aside NPS's statement of no-objection is **likely** to redress the Plaintiffs' injury.

In this case, the Plaintiffs have alleged the relationship between NPS's statement of no-objection and the GCRD and Corps and have shown how a favorable decision in this Court would amount to a significant increase in the likelihood that Plaintiffs would obtain relief that directly redresses their injury. For these reasons, the Court should reject the *Defendants' Motion* with respect to the standing issue.

For the reasons set forth above, the Plaintiffs request that this Court deny *Defendants' Motion to Dismiss*.

Respectfully submitted August 26, 2019.

/s/ Jon L. Schwartz

Jon L. Schwartz
Ga. Bar. No. 631038
Attorney for Plaintiffs

**Jon L. Schwartz, Attorney at Law, P.C.**
1170 Peachtree St., N.E., Suite 1200
Atlanta, GA 30309
404-667-3047 – phone
404-529-4587 - fax
jon@jonschwartz.net

## CERTIFICATE OF SERVICE

I certify that I have this August 26, 2019, served the foregoing

*Response Memorandum* upon all counsel of record by way of the Court's

electronic case filing (ECF) system.


<u>/s/ Jon L. Schwartz</u>

Jon L. Schwartz
Ga. Bar. No. 631038
Attorney for Plaintiffs