# In the United States District Court for the Southern District of Georgia Brunswick Division

FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2020 MAR 19, AM 10: 35

CLERK C. Robinson
SO. DIST. OF GA.

CENTER FOR A SUSTAINABLE COAST
AND KAREN GRAINEY

Plaintiffs,

v.

NATIONAL PARK SERVICE, U.S.
DEPARTMENT OF THE INTERIOR AND
GARY INGRAM, IN HIS OFFICIAL
CAPACITY AS SUPERINTENDENT,
CUMBERLAND ISLAND NATIONAL
SEASHORE,

Defendants.

2:19-CV-58

## ORDER

Before the Court is a Motion to Dismiss, dkt. no. 9, filed by Defendants National Park Service ("NPS"), U.S. Department of the Interior, and Gary Ingram, in his official capacity as Superintendent of the Cumberland Island National Seashore (collectively "Defendants"), as well as a Motion to Amend, dkt. no. 24, filed by Plaintiffs, the Center for a Sustainable Coast ("CSC") and Karen Grainey (collectively "Plaintiffs"). The motions have been fully briefed and are ripe for review. In their Complaint, Plaintiffs allege that Defendants violated 16 U.S.C. § 459i by failing to object to a proposal by non-party Lumar, LLC ("Lumar") to construct a private dock on Cumberland Island,

Georgia. Defendants seek to dismiss Plaintiffs' complaint on the basis that this Court lacks subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs contend that this Court has subject matter jurisdiction to hear their claims or, in the alternative, that the Court should permit them to amend their Complaint to correct any deficiencies.

## BACKGROUND

Cumberland Island is Georgia's largest and southernmost barrier island. In 1972, Congress designated the island as a National Seashore. See 16 U.S.C. § 459i-459i-9 (the "Seashore Act"). The Seashore Act requires, among other things, that Cumberland Island be "permanently preserved in its primitive state," except for certain public recreational uses, § 459i-5; see also High Point, LLLP v. Nat'l Park Serv., 850 F.3d 1185, 1189 (11th Cir. 2017). Since 1972, the Department of the Interior has acquired title to the majority of the island's privately-owned land. High Point, 850 F.3d at 1189. That land, along with all other property within the bounds of the Cumberland Island National Seashore, is managed by Defendant NPS.

Today, Cumberland Island is protected by an amalgam of state and federal law. Most pertinent to the present action is the Georgia Coastal Marshlands Protection Act (the "Marshlands Act"), O.C.G.A. § 12-5-286. The Marshlands Act requires anyone seeking to "construct or locate any structure on or over marshlands in [the]

AO 72A
(Rev. 8/82)

state" to obtain a permit from the Coastal Marshlands Protection Committee (the "CMPC"). See id. § 12-5-286(a). To acquire a construction permit, applicants must first file an application with the Georgia Department of Natural Resources ("GDNR"), which is then required to "notify in writing all adjoining landowners that the application has been received" and "make inquiry to adjoining landowners to ascertain whether or not there is objection to issuance of a permit" (a "Notice Letter"). Id. § 12-5-286(a), (d). The CMPC is required to provide notice of the permit applications by either distributing a public notice by itself or jointly with the United States Army Corps of Engineers (the "Corps"). Id. § 12-5-286(e). In determining whether to approve an application under the Marshlands Act, the CMPC is instructed to consider the "public interest," including:

1)  Whether or not unreasonably harmful obstruction to or alteration of the natural flow of navigational water within the affected area will arise as a result of the proposal;

2)  Whether or not unreasonably harmful or increased erosion, shoaling of channels, or stagnant areas of water will be created; and

3)  Whether or not the granting of a permit and the completion of the applicant's proposal will unreasonably interfere with the conservation of fish, shrimp, oysters, crabs, clams, or other marine life, wildlife, or other resources, including but not limited to water and oxygen supply.

Id. § 12-5-286(g).

The present suit centers around an application filed under the Marshlands Act by Lumar, who owns private property on Cumberland Island. According to Plaintiffs' Complaint, Lumar sought permission from the Georgia Coastal Resources Division ("GCRD")[1] to build a dock over marshlands within the Cumberland Island National Seashore. Dkt. No. 1 ¶ 16. In accordance with the Marshlands Act, the GDNR sent a Notice Letter to the NPS, an adjacent property owner, and inquired whether it objected to the construction of the dock. See id. ¶ 17-18. Defendant Ingram, the NPS Superintendent, responded with a signed statement in which he maintained, "[a]s an adjacent property owner, I have been informed of the intended construction and reviewed the plans and I do not have any objections to the project as proposed." Id. ¶ 19. Following the NPS's response, the GCRD issued a letter to Lumar authorizing construction of the dock. Id. ¶ 21.[2]

After Lumar built the dock, Plaintiffs filed a suit in the Fulton County, Georgia Superior Court contending that Lumar

---

[1] The GCRD is a subdivision of the CMPC. See Coastal Marshlands protection and Shore Protection Committees, Georgia Department of Natural Resources, Coastal Resources Division, available at https://coastalgadnr.org/CommitteesCRD. Both agencies operate under the authority of the GDNR. Id.

[2] In conjunction with its application under the Marshlands Act, Plaintiffs also allege that Lumar sought permission to build the dock from the Corps. Dkt No. 1 ¶ 16. After the NPS declined to object to Lumar's Marshland Act application, the GCRD "provided a notice of concurrence and no objection for the Corps to issue [Lumar] a Letter of Permission to build the dock." Id. ¶ 21. The Corps thereafter issued Lumar a Letter of Permission. Id. ¶ 22. Though it is not clear from Plaintiffs' Complaint under what legal framework Lumar sought and received permission from the Corps, it appears the request may have been pursuant to 36 C.F.R. § 5.7, which forbids construction of, inter alia, boat docks, over federal parks "except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States."

violated the Marshlands Act by constructing a dock without a permit. Id. ¶ 23.[3] While that action was pending, Plaintiffs filed the present action in this court alleging that Defendants violated the federal Seashore Act by failing to object to Lumar's application under the Marshland's Act. Specifically, Plaintiffs contend that Ingram's notice to the GDNR that they did not object to construction of the dock as an adjacent landowner "increased the likelihood" that the GCRD would grant Lumar's permit application. Id. ¶ 20.[4] They requested, inter alia, an injunction setting aside Defendants' notice of no-objection. Dkt. No. 1 at 35.

**DISCUSSION**

## II.  Motion to Dismiss

Defendants' Motion to Dismiss raises a facial attack under 12(b)(1) of the Federal Rules of Civil Procedure. Facial attacks to subject matter jurisdiction "require the court to merely look and see if the plaintiff's complaint has sufficiently alleged a

---

[3] Plaintiffs' allegation in the Georgia state court that Lumar failed to obtain permitting is confounding because they allege in their federal complaint that the GCRD issued "a Letter of Authorization" to build the dock. Dkt. No. 1 ¶ 21. A subsequent Fulton County court order appended to Defendants' reply brief resolves this discrepancy, explaining that the "Plaintiffs' challenge is actually to the Letter of Authorization issued by the [GDNR], in which [G]DNR determined that the dock is exempt from the Marsh[lands] Act." Dtk. No. 18-1 at 3.

[4] A few months after Plaintiffs filed their federal claims, the Fulton County Superior Court issued an order dismissing the Plaintiffs' state action. See Dkt. No. 18-1. Plaintiffs thereafter notified this Court that they intend to appeal that decision. Dkt. No. 19. Because the judgment in the state action is not yet final, any legal findings by the Fulton County Superior Court will not have a dispositive effect on the Court's decision here.

basis of subject matter jurisdiction." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1335 (11th Cir. 2013). Under this framework, allegations in the Plaintiffs' pleading are "taken as true for purposes of the motion." McElmurray v. Consol. Gov't. of Augusta-Richmond County, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting Lawrence v. Dunbar, 919 F.3d 1525, 1529 (11th Cir. 1990)). The burden rests on the Plaintiffs to allege, with particularity, the necessary facts to establish subject matter jurisdiction. Murphy v. Sec'y, U.S. Dep't. of the Army, 769 Fed. App'x 779, 781 (11th Cir. 2019).

Here, Defendants argue that this Court lacks jurisdiction over Plaintiffs' action because the United States has not waived its sovereign immunity with respect to the claims alleged. Federal courts have jurisdiction over suits against the United States and its agencies only if sovereign immunity has been waived. Thompson v. McHugh, 388 Fed. App'x 870, 872 (11th Cir. 2010). To establish such a waiver, Plaintiffs must show both a clear statement from the United states waiving its sovereign immunity and that the claims alleged fall within the scope of that waiver. Id. at 873 ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver.") (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003)).

AO 72A
(Rev. 8/82)

To determine whether the United States has waived its sovereign immunity, the Court must first decide what, if any, causes of action are alleged in the Complaint. Plaintiffs do not dispute Defendants' contention that neither NPS's organic statute, 16 U.S.C. § 1, nor the Seashore Act create private causes of action under federal law. Thus, Plaintiffs' only remaining basis for invoking this Court's jurisdiction is § 702 of the Administrative Procedure Act (the "APA"). In pertinent part, that section provides, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Though Defendants concede that § 702 waives sovereign immunity with respect to certain unlawful agency action, they argue that Plaintiffs' claims do not fall within the scope of that waiver. Specifically, they point to § 704, which limits judicial review under the APA to "final agency action." 5 U.S.C. § 704. Defendants contend that their notice to the GDNR that they did not object to the construction of the dock was not "final agency action" within the meaning of that statute.

In Bennett v. Spear, the Supreme Court identified two factors that must be met for an agency action to be considered final:

> First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations

have been determined, or from which legal consequences will flow.

520 U.S. 154, 177-78 (1997) (internal quotations and citations omitted). Defendants principally challenge the second Bennett factor. They argue that Ingram's letter to the GDNR was not dispositive on GDNR's decision to grant permitting for the dock and therefore did not confer "rights or obligations" or otherwise have any legally binding effect. In other words, GCRD was allowed—and perhaps required—to make an independent determination about whether the dock was in the public interest. In response, Plaintiffs argue that the letter "significantly increased the likelihood" that GCRD and the Corps would allow Lumar to build the dock because NPS has a mandate to preserve Cumberland Island under the Seashore Act and is a "recognized authority in environmental matters." Dkt. No. 15 at 9-10. As such, they contend that legal consequences necessarily followed from the letter.

Two Supreme Court cases are particularly instructive on this point. In Franklin v. Massachusetts, the Court found that the Secretary of Commerce's report to the President tabulating state populations was not a final agency action under the APA. 505 U.S. 788, 798 (1992). In that case, defendant the State of Massachusetts challenged the method used by the Secretary, via the Bureau of Census, to calculate state populations in the United States Census, arguing that the Secretary's method had resulted in the loss of

one of Massachusetts' seats in the House of Representatives. Id. at 790, 795. Under the reapportionment statute, the Secretary was to prepare a report of her tabulations for the President, who was then to transmit a statement to Congress about the number of persons in each state for purposes of apportioning representatives. Id. at 792. In reaching its conclusion, the Court noted that the statute did not require the President to rely on data in the Secretary's report and that "the action that . . . has a direct effect on reapportionment is the President's statement to Congress, not the Secretary's report to the President." Id. at 797. Thus, the Court found that the Secretary's report "serves more like a tentative recommendation than a final and binding determination" and was "not final and therefore not subject to review." Id. at 798.

Under a similar set of facts, the Court in Dalton v. Specter found two years later that a report by the Secretary of Defense regarding military base closure recommendations was not a final agency action. 511 U.S. 462, 464-65, 469 (1994). There, the Secretary was required to submit base closure and realignment recommendations to Congress and to an independent federal commission, the latter of whom would ultimately prepare a report for the President based on part on the Secretary's recommendations. Id. at 465. Relying on Franklin, the Court found that the Secretary's report had "no direct consequences" on base closings

and that the only action that would "directly affect" the military base closures was action taken by the President. Id. at 469 (quoting Franklin, 505 U.S. at 797-98). Thus, the Secretary's reports were "more like a tentative recommendation than a final and binding determination" and therefore not reviewable under the APA. Id. at 469-70.

Like the agency recommendations in Franklin and Dalton, Defendants' letter to the GCRD here was at most "advisory and in no way affected the legal rights of the relevant actors." Bennett, 520 U.S. at 178 (discussing Franklin and Dalton). Plaintiffs' assertion that the letter increased the likelihood that the dock permit would be approved is inapposite. First, Plaintiffs plead no facts to suggest that Defendants' letter had any bearing on GCRD's ultimate decision. Instead, they merely speculate that an objection by the NPS would have influenced the GCRD because they are a "recognized authority in environmental matters." Dkt. No. 15 at 10. However, this argument is bellied by the language of the Marshlands Act, which requires the GCRD to consider a specific set of factors related to the "public interest" in determining whether to approve a permit application. See O.C.G.A. § 12-5-286(g). None of these factors directly take the NPS's opinion into account.

Second, even if Defendants' letter of no-objection influenced the GCRD's decision, the letter did not have a sufficiently determinative effect on the outcome to be a "final agency action"

under the APA. Like the President in Franklin, the GCRD was the only actor to "directly affect" the dock permitting decision. Franklin, 505 U.S. at 797. Because the GCRD was free to make its own determination irrespective of objections by adjacent landowners, the NPS letter "serve[d] more like a tentative recommendation than a final and binding determination" Id. at 798. This is true regardless of how influential Defendants' letter may have been. Indeed, mere "coercive power" does not transform an otherwise advisory agency recommendation into a final agency action. See Flu-Cured Tobacco Coop. Stabilization Corp. v. United States EPA, 313 F.3d 852, 861 (4th Cir. 2002)[5]; see also Parsons v. United States DOJ, 878 F.3d 162, 164, 169 (6th Cir. 2017) (finding that a gang designation by the National Gang Intelligence Center was not final agency action where the designation was "merely an informational agency report" and that it did "not result in legal consequences because it [did] not impose liability, determine legal rights or obligations, or mandate, bind, or limit other government actors").

In both Franklin and Dalton, the agency reports to the President undoubtedly made him more likely to follow their

---

[5] In Flu-Cured Tobacco, the Fourth Circuit held that a report classifying environmental tobacco smoke as a known human carcinogen was not a final agency action under the APA, concluding that despite the fact that the report could produce "coercive pressures on third parties," it ultimately "carrie[d] no 'direct and appreciable legal consequences' [and was therefore] not reviewable under the APA." Id. at 854, 859 (quoting Bennett, 520 U.S. at 178). In so finding, the court relied heavily on the Supreme Court's decisions in Franklin and Dalton. See id. at 860.

recommendations. Nevertheless, the Court in those cases declined to consider the degree to which the reports influenced the President in concluding there was no final agency action. Instead, the ultimate question was whether the agency's decision had a direct impact on the President's final decision. Here, Plaintiffs do not allege that Defendants' letter had any such effect on GCRD's decision to grant Lumar's permit application. Under Bennett, Defendants' letter cannot be considered a "final agency action."

Plaintiffs point to two district court decisions that they contend support their position that Defendants' letter of no-objection was final agency action. Though neither decision is binding on this Court, the Court will address each briefly. In the first opinion, the District of Oregon found that a Biological Opinion issued by the United States Fish and Wildlife Service ("FWS") to the United States Forest Service (the "Forest Service") was a final agency action because the opinion directly affected the Forest Service's potential liability. Cascadia Wildlands Project v. United States Fish & Wildlife Serv., 219 F. Supp. 2d, 1142, 1143, 1148 (D. Or. 2002). The Court noted that under 16 U.S.C. § 1536, if the FWS were to issue an "Incidental Take Statement" as part of the opinion on the effect of a timber sale on a threatened species, the Forest Service would be exempt from civil or criminal sanctions arising from the take as long as it has fully complied with the terms and conditions set forth in the

AO 72A
(Rev. 8/82)

Incidental Take Statement." Id. at 1145. The biological opinion at issue in that case did not contain an Incidental Take Statement and therefore, according to the court, "raise[d] the potential of liability if a [threatened species] [was] taken." Id. at 1148. That, according to the court, "is a legal consequence." Id.[6]

In contrast, there were no definitive legal consequences that flowed from Defendants' letter of no-objection. Indeed, the letter was not binding on the GDNR, nor is it clear that the GDNR was required to consider the letter in its ultimate determination about whether to grant Lumar's permit application. Thus, while the FWS's opinion in Cascadia had a direct and binding legal effect on another entity, this is not so with Defendants' letter.

Friends of Crystal River v. United States EPA, which Plaintiffs also cite, is likewise unpersuasive. There, the defendants challenged the Environmental Protection Agency's ("EPA") decision to withdraw objections originally made to a state agency concerning an entity's application for construction of a golf course. 794 F. Supp. 674, 688 (W.D. Mich. 1992). In finding that the EPA's decision was final agency action, the Court relied primarily on the fact that there was no evidence that "there will

---

[6] The Cascadia court also found, in the alternative, that the FWS opinion was a final agency action because the Forest Service could use part of the opinion "in defense of its actions in a future proceeding." Id. To the extent this constitutes a finding that the persuasive or coercive effect of agency opinions can render them final agency actions under the APA, this Court simply disagrees, as described above.

be any future proceedings between the EPA and the [state agency] on the permit application at issue in this case." Id. However, the court's analysis in that case was focused only on the first Bennett factor: whether the agency action marked "the consummation of the agency's decisionmaking process." Bennett, 520 U.S. at 178 (internal quotation omitted). But the Court neglected to address the second factor: whether the action was "one by which rights or obligations have been determined, or from which legal consequences will flow." Id. (internal quotation omitted). Regardless of whether Friends of Crystal River was wrongfully decided, this Court finds that its holding is inapposite because the dispute in this case focuses on the second Bennett factor.

Finally, in a post-hearing memorandum filed in support of its position, Plaintiffs argue for the first time that Defendants' letter of no-objection was binding on the GCRD—rather than merely persuasive—because of the Supremacy Clause and Property Clause under Articles VI and IV, respectively, of the United States Constitution. See Dkt. No. 25. Specifically, Plaintiffs contend that the Property Clause authorizes Congress to regulate federal land, "'[a]nd when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.'" Id. at 2 (quoting Kleppe v. New Mexico, 426 U.S. 529, 543 (1976). However, the mere fact that the Seashore Act might have authorized Defendants to override CMPC's permitting decision

under the Marshland's Act does not mean that Defendants' response to GDNR's Notice Letter was the appropriate mechanism for doing so. Indeed, Defendants' letter of no objection was a product of a state statutory framework whereby individuals or entities were entitled to oppose permit applications in their role as neighboring landowners. Defendants letter declining to object to Lumar's permit request was not necessarily a finding—much less a final agency decision—that the dock project was allowed under the Seashore Act. To the contrary, Defendants might have chosen not to object to the Notice Letter for a myriad of reasons, including—as the GDNR determined—that the proposed project was not subject to the Marshlands Act.

Undoubtedly, it appears that Defendants did not take any other sort of affirmative action under the Seashore Act to block Lumar's efforts to construct the dock. However, CSC does not challenge Defendants' decisions on the grounds of agency inaction. Section 706 of the APA allows plaintiffs to ask the reviewing court for different types of relief. See 5 U.S.C. § 706. Under § 706(1), the Court may "compel agency action unlawfully withheld." Alternatively, under § 706(2), the court may "hold unlawful and set aside agency action" that is found to be, inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In its prayer for relief, CSC only seeks injunctive relief under § 706(2). Specifically, it requests a

AO 72A
(Rev. 8/82)

"declaratory judgment that Defendants' action was arbitrary and capricious, an abuse of discretion, and contrary to the Seashore Act" as well as an order setting aside Defendants' notice of no-objection. Dkt. No. 1 at 9.

Nor does the Court find that CSC would prevail on a claim under § 702(1). As the Supreme Court has stated, "a claim under § 702(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to *take*." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) (emphasis in original). Aside from the letter of no objection, CSC does not point to any particular action that Defendants should have taken to halt the dock project other than the general allegation that they failed to enforce the Seashore Act. For these reasons, the Court finds that CSC has failed to identify a "final agency action" to form a cognizable claim under the APA and therefore concludes that the its claims are barred by sovereign immunity.[7]

## B.   Motion to Amend

At the hearing held on Defendants' Motion to Dismiss in December 2019, Plaintiffs expressed, for the first time, an intent to request leave to amend their Complaint, which they did by motion

---

[7] Because the Court concludes that it lacks subject matter jurisdiction based on Plaintiffs' failure to plead final agency action under the APA, it need not reach a decision with respect to Defendants' argument that Plaintiffs lack standing.

several days later. Generally, leave to amend should be "freely given . . . when justice so requires." Fed. R. Civ. P. 15(a); see also Bell v. Fla. Highway Patrol, 589 Fed. App'x 473, 474 (11th Cir. 2014). However, leave need not be given where the amendment "would prejudice the defendant, follows undue delays, or is futile." Lacy v. BP P.L.C., 723 Fed. App'x 713, 715 (11th Cir. 2018) (quoting Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1998)). Leave to amend is futile "when the proposed amended complaint would still be subject to dismissal." Id. In other words, leave should be denied where "a proposed amendment failed to correct the deficiencies in the original complaint or otherwise fails to state a claim." Id. (quoting Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1255 (11th Cir. 2008)).

Here, Plaintiffs' Motion to Amend sets forth two possible amendments to their original pleading. In the first (the "First Proposed Amendment"), dkt. no. 24-1, Plaintiffs purport to "provide more specificity" to resolve any deficiencies that may exist in its original pleading, dkt. no. 24 at 4. The Court finds that this supplemental detail does not correct the deficiencies described above and will therefore deny the First Proposed Amendment as futile.

First, this pleading contains allegations about how the Property Clause and Supremacy Clause of the U.S. Constitution would prohibit the GCRD from authorizing the dock. Id. However, as

17

explained above, the Court rejects this argument, which was already set forth in Plaintiffs' post-hearing brief.

Second, Plaintiffs allege that its First Proposed Amendment "show[s] that the Park Service's notification of no-objection was final agency action because it informed Lumar, LLC that the Park Service would not take an enforcement action to stop construction of the dock." Id. at 5. However, it is not clear which portions of the First Proposed Amendment establish this contention. At best, the amendment states that the no-objection letter "caused the Georgia Coastal Resources Division and the Corps to grant Lumar, LLC authorization to construct the dock," dkt. no. 24-1 ¶ 24, and that the GCRD authorized the dock "[i]n reliance on NPS' notification of no-objection," id. ¶ 26. However, these conclusory allegations, without any factual support, are insufficient to allow the Court to determine that Defendants' notice of no-objection was final agency action. See Graveling v. Castle Morg. Co., 631 Fed. App'x 690, 693 (11th Cir. 2015) ("To survive a motion to dismiss, a complaint must offer more than naked assertions that the defendant acted unlawfully or a formulaic recitation of the elements of a cause of action."). Therefore, the Court finds that this amendment also does not resolve Plaintiffs' failure to plead final agency action.

Finally, the First Proposed Amendment provides a great deal of additional detail about why the Georgia State Court improperly

found that the Lumar dock did not violate the Marshlands Act. However, these facts are intended to address Defendants' contention that Plaintiffs lacked standing, a contention this Court found unnecessary to address in light of the finding that sovereign immunity barred Plaintiffs' claims. Accordingly, the Court finds that none of the new allegations in the First Proposed Amendment would be sufficient to survive a motion to dismiss and therefore denies this portion of the motion to amend as futile.

In the second amendment appended to its motion (the "Second Proposed Amendment"), dkt. no. 24-2, Plaintiffs seek to add the Corps, as well as a District Commander of the Corps (collectively, the "Corps Defendants'), as additional parties and to add additional claims particular to the Corps. In Counts II and III, Plaintiffs essentially allege that the Corps violated the National Environmental Policy Act as well as the Seashore Act by issuing a Letter of Permission for Lumar to construct the dock. Because the Court has not yet had an opportunity to pass upon the validity of these claims in a motion to dismiss, it cannot conclusively determine at this stage that the amendment is futile. Nor can the Court find that the amendment is unduly delayed or would cause prejudice to the Corps Defendants at this early stage of litigation. It is a close call. However, at this stage the Court will permit Plaintiffs to amend their complaint to add only those causes of action in the Second Proposed Amendment relating to the

AO 72A
(Rev. 8/82)

addition of the Corps Defendants. It may very well be that the new defendants will likewise prevail on a motion to dismiss. Futility, however, is not certain at present.

## CONCLUSION

For the reasons explained above, Defendants' Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, dkt. no. 9, is **GRANTED**. Plaintiffs' Motion to Amend, dkt. no. 24, is **GRANTED** in part and **DENIED** in part. Plaintiffs' First Proposed Amendment, dkt. no. 24-1, is rejected in full. Plaintiffs' Second Proposed Amendment will be allowed only insofar as it concerns the allegations related to adding the Corps Defendants to this action. Defendants National Park Services, U.S. Department of the Interior and Gary Ingram, in his official capacity as Superintendent, Cumberland Island National Seashore, are hereby **DISMISSED**, without prejudice,[8] from this action. Plaintiffs shall file their Second Proposed Amendment within ten days of this Order. Thereafter, they must serve the Amended Complaint in accordance with the Federal Rules of Civil Procedure.

---

[8] See <u>Stalley v. Orlando Reg'l Healthcare Sys.</u>, 524 F.3d 1229, 1222 (11th Cir. 2008) ("A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice.").

SO **ORDERED**, this 19th day of March, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA