# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CENTER FOR A SUSTAINABLE
COAST, and KAREN GRAINEY,

    Plaintiffs,

    v.

UNITED STATES ARMY CORPS OF
ENGINEERS, and
COLONEL RON STURGEON,[1]
in his official capacity as
District Commander and
District Engineer, U.S.
Army Corps. Of Engineers,
Savannah District,

    Defendants.

2:19-CV-58

## ORDER

    Before the Court is Plaintiffs Center for a Sustainable Coast and Karen Grainey's motion for summary judgment, dkt. no. 68, as well as the U.S. Army Corps of Engineers Defendants' motion for summary judgment, dkt. no. 70. The motions have been thoroughly briefed and are ripe for review. Dkt. Nos. 68, 70, 71, 77, 78, 82, 88, 94, 95. For the reasons stated below, Plaintiffs' motion for summary judgment, dkt. no. 68, is **DENIED**, and Defendants' cross motion, dkt. no. 70, is **GRANTED**.

---

[1] The Clerk is **DIRECTED** to substitute Colonel Ron Sturgeon for Colonel Daniel Hibner as the proper defendant on behalf of the U.S. Army Corps of Engineers, Savannah District.

**BACKGROUND**

This case involves the construction of a dock on Cumberland Island. Plaintiffs, an environmental group and one of its members, ask the Court to set aside a letter of permission to build a private dock on the Island, arguing that the government's decision to authorize it violated the National Environmental Policy Act. Plaintiffs seek review of the agency's action under Section 706 of the Administrative Procedure Act.

I. **Lumar, LLC Acquires Property on Cumberland Island.**

Cumberland Island is the largest barrier island along Georgia's coast, bounded by Cumberland Sound and the Cumberland River to the west and the Atlantic Ocean to the east. See High Point, LLLP v. Nat. Park Serv., 850 F.3d 1185, 1188 (11th Cir. 2017). Beginning in 1970, the federal government, through the National Park Foundation, began acquiring privately-owned land on the Island with sights set on a future national park. Id. at 1189. In 1972, Congress established the Cumberland Island National Seashore. 16 U.S.C. §§ 459i-9 (the "Seashore Act").

The Seashore Act requires, among other things, that Cumberland Island be "permanently preserved in its primitive state," except for certain public recreational uses. Id. § 459i-5(b). Today, the federal government owns most of the land on Cumberland Island, and the Island—accessible to visitors primarily

by boat—remains largely undeveloped. <u>High Point</u>, 850 F.3d at 1188-89.

In early 1998, Lumar, LLC purchased approximately 90 acres of property on the southwest portion of Cumberland Island, fronting water known as "Dungeness Cut," from a private landowner, Georgia Rockefeller Rose. <u>See</u> Dkt. No. 53, Administrative Record ("AR") 246-50. The property remained undeveloped for nearly 18 years, AR 239, that is, until 2015, when Lumar requested a permit from the Army Corps of Engineers to build a "private single family dock" along the property's shoreline. AR 229-30.

## II.   The Corps Issued a Permit for a Single-Family Dock.

Lumar needed the Corps' permission to build the dock because the Rivers and Harbors Act of 1899 requires a permit from the Corps to build any structure in, over, or under a "navigable water of the United States." 33 U.S.C. § 403. In its initial Letter of Permission application, Lumar characterized the dock as "essential" to provide direct access to the property from the mainland. AR 235. Lumar represented to the Corps that it planned "to construct a single family residential structure in the future" once the Corps approved the dock proposal but assured the Corps that there were no final plans for development on the property. <u>Id.</u>

Upon receipt of Lumar's application, the Corps requested a records search, a reconnaissance survey, and a no-objection letter

from the National Park Service due to the project's historically and environmentally significant location on Cumberland Island. AR 224. After some back-and-forth, Lumar agreed to provide a literature search and reconnaissance survey of the 7.3-acre portion of Lumar's property which borders the dock. AR 187, 197-200, 211-13. Lumar then engaged an archeologist to prepare a report for the Corps to assess whether previously discovered or undiscovered archaeological resources exist within the project tract. AR 146-67. Meanwhile, Lumar provided the Corps with no-objection letters from the National Park Service and other adjacent landowners. AR 191-96, 228.

The Corps reviewed the information provided, sought comment from several government agencies and, receiving no objections, put together a "Case Document and Environmental Assessment" for Lumar's dock project. AR 34-47. On March 31, 2016, the Corps issued Lumar's Letter of Permission, along with a proposed permit for Lumar to sign and return. AR 11, 15-20. Lumar returned the signed permit and constructed the dock. AR 1-7; Dkt. No. 33 at 4-5 (citing dkt. no. 1 ¶ 23).

## III.   Plaintiffs' Present Suit Against the Corps

Plaintiff Center for a Sustainable Coast is an organization whose "mission is to ensure and improve the responsible use, protection, and conservation of Georgia's coastal resources," and Plaintiff Karen Grainey is one of its members. Dkt. No. 68-1 ¶¶ 1,

2. Plaintiffs claim they did not know about the project until the dock was under construction and that they would have provided comments if given the opportunity. Id. ¶ 6.

Plaintiffs filed this action in May 2019 against the National Park Service and Gary Ingram, the Superintendent of Cumberland National Seashore, alleging a violation of the Seashore Act. Dkt. No. 1. By that time, construction of the dock was complete. Dkt. No. 33 at 4-5 (citing dkt. no. 1 ¶ 23). This Court granted the Park Service's and Mr. Ingram's motion to dismiss the case for lack of subject matter jurisdiction. Dkt. Nos. 9, 33.

Plaintiffs later filed two amended complaints, this time naming as defendants the Corps and the Corps' Savannah District Commander and Engineer ("the Corps"). Dkt. Nos. 36, 48.[2] In the second amended complaint, the operative pleading, Plaintiffs allege the Corps violated the National Environmental Policy Act and the Seashore Act by permitting Lumar to build the dock. Dkt. No. 48 ¶ 1. Plaintiffs seek a declaratory judgment that the Corps' decision to allow the dock was "arbitrary and capricious, an abuse of discretion, and contrary to [the National Environmental Policy Act] and the Seashore Act" and asks the Court to "[s]et aside and

---

[2] The second amended complaint originally named then-Colonel Daniel H. Hibner as District Commander and Engineer of the Savannah District for the U.S. Army Corps of Engineers. He has since been twice-succeeded by Colonel Ron Sturgeon, who is automatically substituted as the named party in this case under Rule 25(d). See Fed. R. Civ. P. 25(d).

vacate the Corps' Letter of Permission." Id. ¶ 72. To that end, it also asks for an injunction "to preserve Cumberland Island National Seashore's primitive state."[3] Id.

During this litigation, Plaintiffs filed a motion to remand the matter to the agency, or, in the alternative, to supplement the administrative record with extra-record evidence. Dkt. No. 54. Plaintiffs eventually conceded that remand was inappropriate but maintained that the administrative record should be supplemented. Dkt. Nos. 57, 61. This Court denied the motion, holding that Plaintiffs failed to satisfy the "heavy burden" of showing that supplementation of the record was necessary. Dkt. No. 65 at 13.

Both parties moved for summary judgment. See Dkt. Nos. 68, 70. While the motions were pending, this Court ordered the parties to file supplemental briefs addressing, among other standing-related inquiries, the following question: did the Corps consider whether constructing the Lumar dock on Cumberland Island would violate the Seashore Act, such that the Corps duly considered whether the proposed dock would threaten a violation of federal law imposed for the protection of the environment, and therefore

---

[3] Defendants filed the administrative record related to the Letter of Permission it issued to Lumar, along with a declaration certifying the record, in November 2020. See Dkt. Nos. 53, 53-2. The Corps represents that the filed record includes "all documents that were directly or indirectly considered by the [Corps] for the decision to grant a Letter of Permission for the Lumar Dock." Dkt. No. 53-2 ¶ 5.

cause a "significant environmental effect" precluding the use of a categorical exclusion, like a letter of permission, because of "extraordinary circumstances." Dkt. No. 91. The parties filed supplemental briefs. Dkt. Nos. 94-95.

This Court dismissed the case for lack of standing. Dkt. No. 96. The Eleventh Circuit reversed and remanded, holding that Plaintiffs have standing to pursue Count II, the National Environmental Policy Act claim. Ctr. for A Sustainable Coast v. U.S. Army Corps of Eng'rs, 100 F.4th 1349 (11th Cir. 2024). The Parties agreed to stand on the existing summary judgment briefs, dkt. nos. 68, 70, 71, 77, 78, 82, 88, for the merits of the National Environmental Policy Act claim. Dkt. No. 116. The Court now takes up the motions for summary judgment.

## LEGAL AUTHORITY

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, "[w]hen a party seeks review of agency action under the [Administrative Procedures Act ("APA")], the district judge sits as an appellate tribunal." Lane v. United States, 338 F. Supp. 3d 1324, 1331 (S.D. Ga. 2018) (internal quotation marks and citation omitted). "Accordingly, the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing the

administrative record." Id. "Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." Id.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under Section 706, "[t]he reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions" the reviewing court finds to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706. Plaintiffs argue only that the Corps' action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Dkt No. 48 ¶¶ 27, 72.

"To determine whether an agency decision was arbitrary and capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996) (internal quotation

marks omitted). "The arbitrary and capricious standard is 'exceedingly deferential.'" Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (citation omitted). As a result, "a party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." Legal Env't Assistance Found. v. E.P.A., 276 F.3d 1253, 1265 (11th Cir. 2001) (internal quotation marks and citation omitted), abrogated on other grounds by Loper Bright Enter. v. Raimondo, 144 S. Ct. 2244 (2024). However, an agency's decision may be arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Defenders of Wildlife, 733 F.3d at 1115 (citation omitted).

The Court cannot substitute its judgment for the agency's if the agency's conclusions are rational. Id. (citing Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)); see also Sierra Club v. Flowers, 526 F.3d 1353, 1360 (11th Cir. 2008) ("The court's role is to ensure that the agency came to a rational conclusion." (citation omitted)); Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs (PEACH), 87 F.3d 1242, 1246 (11th Cir. 1996) ("The role of

the court is not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." (citation omitted)).

Because "[t]he APA requires meaningful review," the Supreme Court has "stressed the importance of not simply rubber-stamping agency factfinding." Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 490 (1951)). Judicial review under the APA does not relieve the agency of its obligation to develop an evidentiary basis for its findings. See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). To the contrary, the APA reinforces this obligation. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943). In the post-Chevron world, courts "must exercise their independent judgment" to determine whether an agency's interpretation of the statutes it administers comports with the agency's statutory authority. Loper Bright, 144 S. Ct. at 2273. However, the Supreme Court also explained that Section 706 of the APA "does mandate that judicial review of agency policymaking and factfinding be deferential." Id. at 2261 (citing 5 U.S.C. §§ 706(2)(A), 706(2)(E)).

Thus, the question before the Court is: was the Corps' decision to approve the dock arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

**DISCUSSION**

## I.   National Environmental Policy Act Permit Review

The Rivers and Harbors Act of 1899 ("RHA") makes it unlawful to build certain structures in navigable rivers or waters of the United States unless the plans are "recommended" by the Corps and "authorized" by the Secretary of the Army. 33 U.S.C. § 403. Thus, permits for docks over navigable waters, like this one, are subject to the approval of the Army Corps of Engineers. In that approval process, the Corps is subject to the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq ("NEPA").

NEPA requires a rigorous approval process for any "major" projects, including both a formal environmental review and public notice and comment. See 42 U.S.C. § 4332(2)(C); 33 C.F.R. § 325 app. B at 6a, 7a (2022). Yet, some actions are excluded from this process. The Corps' regulations list "categorical exclusions" from NEPA review, one of which is "applications which qualify as letters of permission."[4] 33 C.F.R. § 325 app. B at 6a(5). In cases subject to Section 10 of the RHA, these letters of permission are available when "in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative

---

[4] The other categorical exclusions are "(1) Fixed or floating small private piers, small docks, boat hoists and boathouses[;](2) Minor utility distribution and collection lines including irrigation;(3) Minor maintenance dredging using existing disposal sites; [and](4) Boat launching ramps." 33 C.F.R. § 325 app. B at 6a(1–4).

impacts on environmental values, and should encounter no appreciable opposition." Id. § 325.2(e)(1)(i). Even so, there are "extraordinary circumstances where normally excluded actions could have substantial environmental effects" and thus require the formal environmental review despite the categorical exclusion. Id. § 325 app. B at 6b.

Therefore, the Court now considers whether the administrative record supports the Corps' conclusion that this dock falls under the categorical exclusion for letters of permission, taking the three criteria in turn.[5] The Court finds it does.

## II.  The Administrative Record Supports that the Proposed Work was Minor.

First, the Corps made the required finding that the project is minor in nature. AR 48. The administrative record supports the opinion of the Corps that the proposal was minor because the Corps examined the size, scale, and character of the project.

The Corps issued the permit for a dock that consists of "a 200' x 6' walkway leading to a 14' x 20' pier head with a 4' x 26' aluminum gangway leading to a 10' x 50' floating dock." AR 15. In

---

[5] Defendants argue that Plaintiffs do not contest the first two requirements for a letter of permission, i.e. that the proposed work (1) would be minor and (2) would not have significant or cumulative impacts on environmental values. Although Plaintiffs' primary argument focuses on the third criterion--the appreciable opposition to the dock, Plaintiffs have not conceded any of the requirements. See Dkt. No. 68 at 4-10; Dkt. No. 70 at 17-26.

its evaluation of the permit application, the Corps considered that the dock would extend only 50 feet into the waterway at a point where the waterway is approximately 3,120 feet wide at the average low tide. AR 41. Thus, the Corps concluded approximately 3,070 feet of the waterway would be unobstructed by the dock and still be available for safe boat travel. Id.

Because the Corps' NEPA-implementing regulations specifically list "fixed or floating small private piers" and "small docks" as categorical exclusions, Plaintiffs argue that this dock must then be too large to fall under the enumerated categorical exclusion, and, therefore, cannot fall under the "catch-all" letter of permission. See 33 C.F.R. § 325 app. B at 6a; Dkt. No. 68 at 6–7. Plaintiffs cite only the proposed, unadopted rule with no force of law to support their argument. See Dkt. No. 68 at 7 (citing Proposal to Amend Nationwide Permit Program Regulations and Issue, Reissue, and Modify Nationwide Permits, 56 FR 14598, 14616 (proposing criteria for "small docks" for nationwide permits under which the Lumar Dock would not qualify as a small dock)). The Court is unaware of any basis to conclude that because a permit application may not fit one of the four enumerated categorical exclusions, the Corps cannot issue a permit under the fifth category, letters of permission. See 33 C.F.R. § 325 app. B at 6a. In other words, the argument that if this project does not fit into the "small docks" category, it is automatically a major

13

project holds no water, so to speak. To the contrary, the Corps encouraged district engineers "to utilize the Letter of Permission process to authorize small docks and piers." Final Rule for Nationwide Permit Program Regulations and Issue, Reissue, and Modify Nationwide Permits, 56 FR 59110, 59128 (Nov. 22, 1991) (postdating the promulgation of the Corps' NEPA-implementing regulations listing the five categorical exclusions, including (1) small docks and (5) letters of permission). Thus, the Corps' NEPA-implementing regulations allow the Corps to issue a letter of permission for a dock if the proposed dock meets the three criteria, i.e., minor, no significant individual or cumulative impacts on environmental values, and no appreciable opposition.

Plaintiffs further rely on Arkansas Nature Alliance, Inc. v. United States Army Corps of Engineers, 266 F. Supp. 2d 876, 885 (E.D. Ark. 2003), to argue that the proposed work is intrusive and worthy of opposition. The Arkansas Nature Alliance case, however, stands for the proposition that "the Corps drafters intended the categorical exclusions, including the 'letter of permission,' to cover…non-intrusive projects" and exemplifies when a project is not "minor" within the meaning of the relevant regulations. Id. In that case, real estate developers applied for a permit to raise and rebuild a low-water crossing over the White River in Arkansas; the Corps approved the permit through a letter of permission. Id. at 880. The new bridge was twice as large as the old low-water

crossing. Id. at 886. "The permit to change the size of the bridge was also intended to change the purpose of the bridge from a low-water, cattle and farm-machinery crossing, to the means of ingress and egress to a 49-lot subdivision." Id. Therefore, the court concluded that approved action was not minor. Id.

In this case, the Corps considered that the dock would cover less than two percent of the width of the waterway at low tide. AR 41. The Corps also assessed whether the dock would change the character or purpose of the southwest shore of Cumberland Island. It concluded that the dock would not because numerous similar docks already exist in the area, and the residential dock would cause very little increase in boat traffic. AR 40-41. Thus, the Corps' finding that the work was minor was neither arbitrary nor capricious. The finding was not an abuse of discretion, nor did it conflict with the law. The agency's interpretation comports with its statutory authority.

**III. The Administrative Record Supports that the Proposed Work Would Not Have Significant Individual or Cumulative Impacts on Environmental Values.**

The Corps made the requisite finding that the project would not have significant individual or cumulative impacts on environmental values. AR 48. In so finding, the Corps analyzed three overarching categories: (1) wildlife conservation, (2) archeological and historic preservation, and (3) land and sea

15

conservation.

**A. Individual Impacts**

*First*, the Corps determined that the dock would not have significant impacts on wildlife conservation. The Corps considered that the "increased activity in the area and minor sediment disturbance that would occur during construction" would impact the aquatic life in the waterway but noted that this disturbance would be minor and temporary. AR 43. The Corps also determined that the West Indian manatee is the only threatened or endangered species potentially affected by the dock; because of this, the Corps attached special conditions to the permit to protect the manatees from adverse effects. Id. The Corps requested and received concurrence on the permit from the U.S. Fish and Wildlife Service, the agency charged with conserving and protecting fish, wildlife, plants and their habitats. AR 53; 16 U.S.C. § 742a. Lastly, the Corps considered that the project would not impact any wildlife refuges. AR 42. Thus, the Corps determined the impact to species would be inconsequential, and the administrative record supports that finding.

*Second*, the Corps ultimately concluded that "the proposed work would have no effect upon historical, archeological, and/or architectural concerns." AR 41. Plaintiffs, however, correctly assert that the Corps allowed Lumar to survey only 7.3 acres of its 95-acre property for archeological resources. Dkt. No. 68 at

2-3. Despite this, the administrative record does not contain any reason why the Corps should have distrusted Lumar's assertion that this 7.3-acre study included "substantially more area than the Applicant would potentially need for the construction of a future structure" and included "the entire water frontage" for the dock. AR 175.

Further, the administrative record shows the Corps carefully considered whether this survey area was sufficient before recommending Lumar proceed with the reconnaissance survey and broader literature search. AR 172. Lumar engaged an archeologist to conduct the archaeological resources literature review, complete the reconnaissance fieldwork, and draft a report. AR 146. The results of the reconnaissance survey and literature search revealed there are four archaeological sites and two historic districts within a one-mile radius of the project tract, none of which would be impacted by the dock or a possible future house on the 7.3-acre project tract. AR 154. The archeologist's 21-page report explains why there was a low likelihood of any subsurface archeological deposits or any historically significant land use on the tract. AR 164-65. Finally, the Corps consulted the Georgia Historic Preservation Division—providing a copy of the report and engaging in a thorough review of the report—to determine that no historic properties would be affected. AR 56, 58-82, 144. Thus, Plaintiffs' argument that the survey could have been *more* extensive

17

does not render the conclusion on historical and archeological resources—made by archeologists and historic preservation experts and supported by the field work and report—unreasonable, arbitrary, or capricious.

*Third*, the Corps ascertained that there would be no significant impact on the physical environment, including soil and water resources. Lumar's initial application provided that "[n]o fill material, dredging, or excavation [was] required for the project." AR 236. The construction was to take less than one year to complete. AR 231. Nevertheless, the Corps considered that there would be a minor sediment disturbance and temporary disturbance to water and air quality while the dock is under construction. AR 41. There would not be, however, any lasting impact to mineral resources, any soil loss, any shoreline erosion, or any harm to wetlands. AR 41–42. Further, the dock would not disrupt the water supply or impact flood levels on Cumberland Island. AR 42. Thus, the Corps' finding on environmental concerns is neither arbitrary nor capricious. It was not an abuse of discretion, nor was it contrary to the law.

### B. Cumulative Impacts

To issue a letter of permission, the Corps must also conclude that the proposed work would not have significant cumulative impacts on environmental values; it made that conclusion here. 33 C.F.R. § 325.2(e)(1)(i); AR 36. Plaintiffs argue that this finding

was unreasonable because the dock approval will snowball, or has already snowballed, into major development on Cumberland Island. Dkt. No. 68 at 12. Plaintiffs cite only to the portion of the administrative record showing the transfer of the deed to the property in 1998. Id. (citing AR 246–51). The fact that Lumar sought a hardship variance to construct a ten-house subdivision on the property is not contained within the administrative record. Because it is firmly established that the Court is confined to the administrative record in deciding this case, the Court does not consider this argument in its analysis of the dock's cumulative impact. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971); PEACH, 87 F.3d at 1246 (11th Cir. 1996).[6] To be certain, it is the permitting of the dock that is under review in this case, not future county zoning decisions.

It is undisputed the Corps coordinated with the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, the Georgia Department of Natural Resources, Coastal Resources Division, and the adjacent property owners, including the National

---

[6] This Court has previously denied Plaintiffs' motion to supplement the administrative record with extra-record evidence, dkt. no. 65, and granted Defendants' motion to strike extra-record evidence, dkt. no. 79; see also Dkt. No. 116, ¶ 3 ("Plaintiffs' position is this Court should also consider the Parties' statements of material facts and the responses thereto . . . except for parts this Court held 'may not be considered for purposes of the underlying APA review.'" (citing Dkt. No. 96 at 910 (striking Dkt. No. 77 ¶ 57 ("[T]he main road will be adjacent to ten parcels if the Camden County Planning Commission's variance is upheld.")))).

Park Service. AR 36. It also consulted internally with the Corps' Navigation Section. Id. None of these stakeholders objected to the project, as proposed. Id. This coordinated effort with other agencies demonstrates the Corps' consideration of the project's cumulative impact beyond its individual impact analysis.

## IV. The Administrative Record Supports that the Proposed Work Should Encounter No Appreciable Opposition.

The last requirement for a letter of permission provides that the Corps determine that the proposed work should encounter no appreciable opposition. 33 C.F.R. § 325.2(e)(1)(i). Plaintiffs make several arguments against the Corps' finding that the dock would not encounter opposition.

Plaintiffs' primary argument is that the Corps should have anticipated at least some appreciable opposition because, as this Court has said before, the "public has a strong interest in preserving Cumberland Island in a primitive state." Dkt. No. 68 at 8 (quoting United States v. Jenkins, 714 F. Supp. 2d 1213, 1224 (S.D. Ga. 2008)).[7] Of course, Congress designated the island a protected national seashore, 16 U.S.C. §§ 459i-9, to be preserved in its primitive state.

But that is, ultimately, ill-fitting support for the argument

_____

[7] There is another part of Jenkins balancing inquiry: "On the other hand, the public has an interest in seeing that the rights of individuals are not trammeled by government bureaucracies." 714 F. Supp. 2d at 1224.

that the administrative record fails to reasonably support the Corps' conclusion that the dock would not encounter appreciable opposition. To begin with, the argument overlooks the extent to which the administrative record accounts for the unique, undeveloped nature of Cumberland Island. See, e.g., PEACH, 87 F.3d at 1246 ("The focal point for judicial review of an administrative agency's action should be the administrative record."); see also AR 239 (photo of the undeveloped project site); AR 147 (describing the undeveloped project tract as moderately to densely wooded with saw palmettos, large live oaks, and smaller mixed hardwoods). There is no reason to believe that the Corps simply forgot that Cumberland Island is a National Seashore—the administrative record recognizes as much, so the Corps' public interest review is naturally read against that backdrop. AR 37, 224 ("Since the proposed dock facility is on Cumberland Island, please provide us with a letter from the National Park Service stating that they do not have any objections to the proposed project."); AR 235 (initial Letter of Permission application identifying the location as a National Seashore). Judicial review is not a formalistic search for magic words; the fact that the administrative record does not spell out the interest in preserving Cumberland Island in its primitive state using a precise order of words does not discount the Corps' consideration of the unique character of Cumberland Island throughout the record. Compare Dkt. No. 82 at 7 ("the

21

administrative record doesn't even include the term 'primitive.'")
with AR 41-42, 147-153, 212, 226 (reflecting the undeveloped, lush
nature of Cumberland Island).

Importantly, the Corps argues, and the administrative record
supports, that the Corps did not anticipate appreciable opposition
on this front because there are similar docks nearby along the
seashore. AR 40, 149. Because there are "numerous docks of similar
layout and style" in the public's view as they pass the project
location to get to the National Park Service's Sea Camp Dock, the
Corps reasonably concluded that this dock would have a negligible
effect on the environmental aesthetic. AR 40.

Further, Plaintiffs take issue with the Corps' argument that
it relied on the National Park Service, among other agencies, to
evaluate the opposition to the project. Dkt. No. 82 at 2-3 ("And
just because an *agency* expresses it has no objection to a project
doesn't mean *public* opposition shouldn't be expected." (emphasis
in original)). This takes for granted, however, that the Corps'
jurisdiction is limited to the navigable waterways of the United
States. See 33 U.S.C. § 403. The Park Service is in the best
position to communicate public opposition to another dock as the
Park Service engages with the public visitors to Cumberland Island
on a nearly daily basis. See Dkt. No. 78 at 2-3 (citing 16 U.S.C.
§§ 459i, 459i-1, 459i-5).

There is no serious argument that the record shows the Corps

"entirely failed to consider [this] important aspect of the problem." Ala.-Tombigbee Rivers Coal v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir. 2007). And Plaintiffs never explain why the Corps' conclusion "runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view[.]" Id.; see also Ark. Nature Alliance, 266 F. Supp. 2d at 889 (rejecting the Corps' finding of no appreciable opposition where the agency "had actual notice of interest and opposition to the permit" in advance of issuing it and had "dodged public notice by issuing [a letter of permission]" rather than using the standard permitting process for actions of that type). Simply put, Plaintiffs' belief that the Corps should have considered Cumberland's primitive state in its "appreciable opposition" analysis does not make it so.

Relatedly, Plaintiffs argue that the public could not put the Corps on actual notice of its opposition, as in Arkansas Nature Alliance, because the Corps did not provide an opportunity for public notice and comment.[8] Dkt. No. 68 at 19. This argument fails simply because if the "appreciable opposition" standard for a

_____

[8] Likewise, Plaintiffs' argument that the "Case Document and Environmental Assessment" prepared by the Corps is actually a formal "Environmental Assessment" within the meaning of 33 C.F.R. § 325 and thus required formal notice and comment fails. Dkt. No. 28 at 21-24. The administrative record leaves no doubt that the permit application was a request for a letter of permission; therefore, the letter of permission criteria govern the Court's review. See AR 1-9, 35, 224-25.

letter of permission required the Corps to provide for public comment, then the regulations would not exempt letters of permission from notice and comment. 33 C.F.R. § 325.2(e)(1) (Letters of permission are issued "without the publishing of an individual public notice.").

Finally, it is important to look at the actual language of the requirement. The Corps is not charged with ensuring that there will be no opposition. There obviously is some. Rather, the Corps is to determine that the proposed work should encounter no appreciable opposition. 33 C.F.R. § 325.2(e)(1)(i). Given the multiple sources of input the Corps sought and the character of the surroundings, the Corps' decision was neither arbitrary nor capricious. The finding was not an abuse of discretion, nor did it conflict with the law.

**V.   Cumberland Island's Character as a National Seashore Does Not Trigger an Extraordinary Circumstance.**

Plaintiffs finally argue that this permit constitutes one of the "extraordinary circumstances where normally excluded actions could have substantial environmental effects" and thus, requires the formal NEPA review. 33 C.F.R. § 325 app. B at 6b. Specifically, Plaintiffs argue the issuance of the permit is arbitrary and capricious because the Corps did not seem to consider whether the project's location on a National Seashore was an extraordinary

circumstance.[9] Dkt. No. 68 at 10–15. In its supplemental briefing, Plaintiffs clarify that the failure to consider the National Seashore or the ramifications of the Seashore Act was contrary to law. Dkt. No. 95.

First, 40 C.F.R. § 1508.4 requires that the agency's procedures for categorical exclusions must account "for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4 (2016).[10] This provision does not require an individualized analysis of extraordinary circumstances for each permit application but rather requires that the agency take into account these extraordinary circumstances with a significant environmental effect when promulgating the NEPA-implementing regulations. Id. Importantly, Plaintiffs do not challenge the underlying NEPA-implementing regulations, 33 C.F.R. § 325, only the agency action in issuing the permit.

---

[9] The Eleventh Circuit affirmed this "[C]ourt's decision that the Center lacked standing to bring Count I," the Seashore Act claim, but made clear "the Center may still argue (as part of Count II) that the Seashore Act is one reason that issuing a letter of permission rather than completing a NEPA review was arbitrary and capricious." Ctr. for a Sustainable Coast, 100 F.4th at 1359; Dkt. No. 117.

[10] The Council on Environmental Quality published a new NEPA-implementing rule in September 2020, after this litigation had already begun. The parties agree that the claims in this case fall under the 1978 regulations (as amended in 1986), which are codified at 40 C.F.R. Part 1500 (2016). See Dkt. No. 68 at 4, n.13; Dkt. No. 70 at 2-3 n.2.

Second, Plaintiffs fail to cite any authority for the contention that designation as a National Seashore automatically creates an extraordinary circumstance within the meaning of the NEPA-implementing regulations of which the district engineer should have been aware. Further, the Corps' regulations pursuant to 40 C.F.R. § 1508.4 require that:

> District engineers should be alert for extraordinary circumstances where normally excluded actions could have substantial environmental effects and thus require [formal review]. For a period of one year from the effective date of these regulations, district engineers should maintain an information list on the type and number of categorical exclusion actions which, due to extraordinary circumstances, triggered the need for [formal review].

33 C.F.R. § 325 app. B at 6b. The Court cannot write into the regulations that "substantial environmental effects" means when the project tract is subject to the Seashore Act, and thus is a National Seashore, more formal procedures are required for a minor project. See, e.g., Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it." (citation omitted)); Washington v. Comm'r of Soc. Sec., 906 F.3d 1353, 1362 (11th Cir. 2018) ("[W]e construe regulations and other regulatory materials in much the same way we interpret statutes." (citation omitted)). Even so, the administrative record supports that the Corps adequately considered the proposed project's environmental effects on Cumberland Island. See supra Sections II-IV. Therefore, that

26

the Corps did not use the words "primitive state" does not nullify its lengthy environmental effects analysis for the National Seashore. <u>See</u> AR 34-49, 224, 235.

**CONCLUSION**

The Corps' decision to approve the dock was not arbitrary nor capricious. Nor was the decision an abuse of discretion. The decision was in accordance with the law. In the exercise of the Court's independent judgment, the Court finds that the record supports the Corps' interpretations and its actions comport with its statutory authority. For these reasons, Plaintiffs' motion for summary judgment, dkt. no. 68, is **DENIED**, and Defendants' motion, dkt. no. 71, is **GRANTED**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 21st day of October, 2024.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA